**Anzon LEAD, Petitioner,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (Glen SEXTON, Decedent; Ellen Superfine, Widow), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 1, 2002.
Decided April 19, 2002.

Stephen J. Harlen, Philadelphia, for petitioner.

Kenneth R. Schuster, Media, for respondent.

Before FRIEDMAN, J., LEAVITT, J., and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

Anzon Lead (Employer) petitions for review of an August 13, 2001 order of the Workers' Compensation Appeal Board (WCAB) affirming, as modified, the decision of a workers' compensation judge (WCJ) to grant the fatal claim petition filed by Ellen Superfine (Claimant), widow

of Glen Sexton (Decedent).[1] The WCAB modified the award of benefits by allocating fifty-one percent to Claimant and nine percent to Decedent's son. We affirm.

On May 2, 1994, Decedent suffered a work-related back injury while working as a chemist for Employer.[2] On June 1, 1994, Employer issued a corrected Notice of Compensation Payable (NCP) describing the injury as a lumbar/thoracic strain and contusion and paid Decedent disability payments at a rate of $395.22 per week, based on an average weekly wage of $592.93.[3] (WCJ's Findings of Fact, No. 1.)

On October 27, 1997, Claimant filed a fatal claim petition seeking benefits pursuant to section 307 of the Workers' Compensation Act (Act).[4] In the fatal claim petition, Claimant alleged that on March 17, 1997, while Decedent was suffering from depression caused by his work injury, Decedent took a powerful narcotic, resulting in his death. (R.R. at 2a; WCAB decision at 2.) Employer filed an answer denying the allegations. (R.R. at 5a.) Hearings on the fatal claim petition were held before the WCJ at various times between August of 1996 and April of 1998.

At the hearings, Claimant submitted deposition testimony on her own behalf in support of the fatal claim petition. Claimant testified that Decedent had been twice married and divorced before she married Decedent on November 10, 1996.[5] Claimant indicated that Decedent had two sons from his prior marriages and provided financial support to one of his sons, Ryan, who was born on February 8, 1994.[6] Ryan did not live with Decedent, but spent weekends and some extended periods of time visiting Claimant and Decedent. (WCJ's Findings of Fact, No. 17.)

As to Decedent's physical and mental condition, Claimant testified that, when she first met Decedent in 1993 at the Powerhouse Gym in Philadelphia, Decedent had no signs of a back injury or depression.[7] (WCJ's Findings of Fact,

---

1. The WCAB also affirmed other aspects of the WCJ's decision that are not at issue here.

2. The record shows that Decedent was carrying a bag of resin up steps when he fell backwards, injuring himself. (R.R. at 19a.)

3. Employer had issued an "estimated" NCP on May 20, 1994, providing for a weekly compensation rate of $246.50, based on an average weekly wage of $300.00, (O.R.), but Employer increased the amount of compensation in the corrected NCP.

4. Section 307 of the Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 561, provides:
   In case of death, compensation shall be computed on the following basis, and distributed to the following persons: Provided, That in no case shall the wages of the deceased be taken to be less than fifty per centum of the Statewide average weekly wage for purposes of this section ...
   2. To the widow or widower, if there be no children, fifty-one per centum of wages, but not in excess of the Statewide average weekly wage.

3. To the widow or widower, if there be one child, sixty per centum of wages, but not in excess of the Statewide average weekly wage ...
   7. Whether or not there be dependents as aforesaid, the reasonable expense of burial, not exceeding three thousand dollars ($3,000), which shall be paid by the employer or insurer directly to the undertaker (without deduction of any amounts theretofore paid for compensation or for medical expenses).

5. Claimant submitted the divorce decrees from each of Decedent's prior marriages as well as a marriage license as proof of her marriage to Decedent. (WCJ's Findings of Fact, No. 17.)

6. The other son, Glenn, Jr., was adopted by his stepfather, (R.R. at 16a), and, thus, was not a child of Decedent at Decedent's death.

7. Claimant stated that, when she met Decedent in April of 1993, he was lifting weights six days per week, for one to one and a half

No. 23.) However, Claimant testified that, following Decedent's 1994 work injury, Decedent exhibited many behavioral and emotional changes connected to his work-related injury.[8] (WCJ's Findings of Fact, No. 18.)

Claimant then testified about Decedent's death on March 17, 1997, describing the events of that day. Claimant testified that, although she was scheduled to work late that night, she came home by 5:10 p.m. because Decedent was extremely upset.[9] Claimant stated that when she arrived home, Decedent was red in the face and had eyes swollen from crying, so she took him upstairs and put him to bed while she made dinner. (WCJ's Findings of Fact, No. 19.)

Later, when Claimant went to check on Decedent, she found him hunched over a desk with a purple face, so she called for help. Emergency personnel arrived and found a needle, a fentanyl patch and an incision mark on Decedent's arm, which was covered with a cotton swab.[10] Decedent was taken to the hospital where he was pronounced dead.[11] (WCJ's Findings of Fact, No. 20.)

Claimant testified that, approximately two weeks before his suicide, Decedent was arrested on charges of credit card-related crimes. During the arrest, the police handcuffed Decedent and searched

---

hours per day. Decedent was involved in body building competitions, played ball with his son, ran sprints at the track, and was happy, laughing, joking and a free spirit. Claimant testified that she was unaware of any prior psychological problems or treatment Decedent might have had. (WCJ's Findings of Fact, No. 18.)

8. Claimant said that Decedent was unable to go to work or the gym, play ball with his son or perform any physically demanding activities. Decedent could not sit or stand very long, he had to lie down often for relief from his back pain, and his sleep became erratic. (WCJ's Findings of Fact, No. 18.) Claimant stated that sometimes she would find Decedent sitting downstairs in the middle of the night crying because he was unable to sleep due to his back pain. Claimant testified that Decedent never cried before 1994, but after his work injury, Decedent cried frequently. (WCJ's Findings of Fact, No. 22.) Claimant described Decedent as becoming very depressed, mentally unorganized, moody, frustrated, closed in and unhappy because he could not work. (WCJ's Findings of Fact, No. 18.)

Claimant testified that Decedent attempted suicide in July of 1996 by taking pills and drinking wine. Decedent left a note stating that he was not happy with himself, nobody was going to help, and he wanted to relieve himself of the pain. Then, on February 1, 1997, Decedent attempted suicide again.

Claimant testified that, to her knowledge, Decedent never attempted suicide before his 1994 work injury. (WCJ's Findings of Fact, No. 21.)

9. Claimant testified that, earlier that day, Decedent had appointments with Dr. Miller, a psychiatrist, and Dr. David Schrieber, a psychologist. Decedent called her at 11:00 a.m., after his first appointment, crying because he felt that Dr. Miller did not care about him. After Decedent saw Dr. Schrieber in the afternoon, he called Claimant at 4:30 p.m., upset again and saying that the doctor did not take care of him. (WCJ's Findings of Fact, No. 19.)

10. Claimant testified that she found a note in Decedent's handwriting listing medications he had taken that night. (WCJ's Findings of Fact, No. 20.) Decedent's note listed the following medications:

4:30 p.m. Started ingesting Valium and Xanax unknown dosage
5:10 p.m. 7.5 mg Compazine Em to control vomiting from fentanyl and Valium, Xanax IV 30 mg fentanyl
(R.R. at 258a.)

11. Claimant submitted into evidence a letter, dated March 26, 1997, notifying Employer of Decedent's death, (WCJ's Findings of Fact, No. 24), which the WCJ found to be sufficient timely notice. (WCJ's Findings of Fact, No. 51.)

the house. Claimant acknowledged that Decedent left a suicide note that referred to the arrest;[12] however, Claimant indicated that Decedent's attorney had assured Decedent that he would get probation. In fact, Claimant testified that, after the arrest, she and Decedent did not talk about the charges; rather, Decedent's back symptoms continued to be his greatest concern, and they talked mostly about Decedent's symptoms. (WCJ's Findings of Fact, No. 23.)

Finally, Claimant testified about her financial dependence on Decedent at the time of his death, stating that, because she and Decedent were living together and sharing expenses, Decedent's death had left her financially strapped. (WCJ's Findings of Fact, Nos. 19, 22.) Claimant also submitted into evidence copies of bills from Decedent's funeral and Shiva period totaling $5,395.18.[13] The WCJ found Claimant's testimony to be credible and convincing in its entirety. (WCJ's Findings of Fact, No. 50.)

In support of the fatal claim petition, Claimant also submitted the deposition testimony of three medical experts: William T. Ingram, II, D.O., board-certified in family practice; Dimitri L. Contostavlos, M.D., expert medical examiner; and Jacques Lipetz, Ph.D., licensed psychologist. (WCJ's Findings of Fact, Nos. 6–16, 25–35.)

Dr. Ingram testified that, at Decedent's most recent visit in February of 1997, Decedent still had not recovered from his 1994 work injury and continued to suffer from a thoracic and lumbrosacral sprain and strain, a post-traumatic herniated disk at L4–5 and a post-traumatic right L5 radiculopathy caused by the work injury. Dr. Ingram stated that Decedent was depressed as a result of his work injuries, and Decedent's inability to be active or work from his work-related injuries had a meaningful role in why Decedent committed suicide. The WCJ found the testimony of Dr. Ingram to be credible and convincing in its entirety. (WCJ's Findings of Fact, No. 48.)

Dr. Contostavlos testified that Decedent died from self-injected fentanyl and stated that anyone who takes the step of suicide is to some degree deranged. (WCJ's Findings of Fact, No. 52.) Decedent's death certificate, completed and signed by Dr. Contostavlos, indicated that Decedent died on March 17, 1997 from fentanyl poisoning with the significant contributing factor of depressive psychiatric disorder. The WCJ credited Dr. Contostavlos' testimony and found the death certificate convincing and corroborative of Dr. Contos-

---

**12.** After Decedent's suicide, Claimant found notes Decedent had written to her and Ryan. (WCJ's Findings of Fact, No. 20.) Decedent's letter to Claimant stated the following:

What I do now is out of many things. One I know is selfish—but life will go on strong for you and Ryan and Glenn Jr.

I do this also not to disgrace you or me or your family being convicted of such crimes. I know I will never work in a place of prestige because of my background. So [sic] I will never be able to give the world my true gift.

I love you and "you are the one in whom my soul delights."

I hope there is some "life force" after physical death. Because [sic] I want to bond with you eternally.

All I have is yours Ellen, my beautiful wife.

You won't be able to get the title for the truck but keep it inspected and the tags renewed, you'll always have that.

All I have are my V.A. benefits. Sorry, I wish I could give you more.

ALL my love sweetheart....

(R.R. at 97a–98a.)

**13.** The dates on the bills reflect that, on March 19, 1997, Claimant paid in excess of $3,000 in funeral expenses. (WCJ's Findings of Fact, No. 22.)

tavlos' testimony. (WCJ's Findings of Fact, No. 53.)

The WCJ also credited the testimony of Dr. Lipetz that Decedent suffered a psychiatric injury in the nature of depression as a result of his 1994 work injury. The WCJ further credited Dr. Lipetz's testimony that Decedent's chronic pain and physical injury caused Decedent to become dominated by a disturbance of the mind of such severity as to override Decedent's normal, rational judgment and result in Decedent's suicide. (WCJ's Findings of Fact, No. 54.)

In opposition to the fatal claim petition, Employer submitted the deposition testimony of two medical experts: Wolfram Rieger, M.D., psychiatrist; and Jack Snyder, M.D., medical doctor, toxicologist, pathologist and attorney. (WCJ's Findings of Fact, Nos. 36–37, 43.) However, the WCJ rejected both Dr. Rieger's and Dr. Snyder's testimony as incredible and unpersuasive. (WCJ's Findings of Fact, Nos. 55–56.)

In a February 3, 1999 order, the WCJ granted Claimant's fatal claim petition, concluding that Claimant satisfied her burden of proof that she is entitled to all benefits allowable under the Act, including burial expenses. (WCJ's Conclusions of Law, No. 4.) The WCJ ordered Employer to pay Claimant benefits at the rate of $355.70 per week, representing sixty percent of Decedent's average weekly wage, from March 17, 1997 to the indefinite future, plus $3,000 for burial expenses.

■ Employer appealed to the WCAB, arguing that Claimant failed to prove the "chain of causation" test [14] because Decedent's suicide note, in particular, supports a finding that Decedent's suicide was caused by his recent arrest, not his work injury. The WCAB disagreed. Concluding that the WCJ's decision was supported by Claimant's doctors' credible testimony, the WCAB determined that the WCJ did not err by deciding that Decedent's work injury caused depression, which led him to override rational judgment and commit suicide. The WCAB also rejected Employer's argument that because Decedent's death resulted from the illegal use of the controlled substance fentanyl, his death was not compensable under section 301(a) of the Act.[15] The WCAB concluded that, although the overdose of fentanyl killed Decedent, "it was not the cause of death but rather the instrument of death." (WCAB's decision at 12, n. 4.)

However, in response to Employer's argument that Claimant was entitled to fifty-

---

**14.** Under the "chain of causation" test, a claimant must prove:

   1) that there was initially a work-related injury as defined by [s]ection 301(a) of the Act; 2) which injury directly caused the employee to become dominated by a disturbance of mind of such severity as to override normal rational judgment; and 3) which disturbance resulted in the employee's suicide.

*McCoy v. Workmen's Compensation Appeal Board (McCoy Catering Services, Inc.),* 102 Pa.Cmwlth. 436, 518 A.2d 883, 884–85 (1986), *appeal denied,* 517 Pa. 595, 535 A.2d 84 (1987).

**15.** Section 301(a) of the Act, 77 P.S. 431 (emphasis added), provides:

   Every employer shall be liable for compensation for personal injury to, or for the death of each employe, by an injury in the course of his [or her] employment, and such compensation shall be paid in all cases by the employer, without regard to negligence, according to the schedule contained in sections three hundred and six and three hundred and seven of this article: Provided, That *no compensation shall be paid when the injury or death is intentionally self-inflicted, or is caused by the employe's violation of the law, including, but not limited to, the illegal use of drugs,* but the burden of proof of such fact shall be upon the employer.....

one percent, rather than sixty percent, of Decedent's benefits under section 307 of the Act, the WCAB modified the WCJ's decision to award fifty-one percent of wages to Claimant and nine percent to Decedent's son, Ryan. In doing so, the WCAB relied on *Snader v. Workers' Compensation Appeal Board (Arthur A. Brenize Trucking),* 777 A.2d 527 (Pa.Cmwlth. 2001), in which this court affirmed a WCJ's award of fifty-one percent of benefits to a widow and nine percent to a surviving son, who was unrelated to the widow and did not live with her.

Employer now petitions this court for review,[16] first renewing its argument that Claimant is not entitled to benefits under section 301(a) of the Act because Decedent's death was both intentionally self-inflicted and caused by Decedent's illegal use of drugs. We disagree that compensation is barred under section 301(a).

■■■ Under section 301(a) of the Act, an employer is not liable for compensation when an employee's death is self-inflicted. 77 P.S. § 431; *Pennsylvania Power & Light v. Workers' Compensation Appeal Board (Lechner),* 719 A.2d 1116 (Pa. Cmwlth.1998), *appeal denied,* 559 Pa. 697, 739 A.2d 1061 (1999). However, section 301(a) does not preclude an award of benefits in all such cases, and a suicide may be compensable if it is shown to be unintentional under the chain of causation test. *Id.* "This test allows compensation if a suicide is caused by pain, depression or

despair resulting from a work-related injury so severe as to override rational judgment." *SCM Corporation v. Workmen's Compensation Appeal Board (Shullman),* 102 Pa.Cmwlth. 536, 518 A.2d 887, 888 (1986). After careful examination of the record, we are satisfied that the WCJ properly determined that Claimant met her burden of proof under the chain of causation test.[17]

■■■ To meet her burden of proof, Claimant presented the credible testimony of three medical experts. Dr. Ingram testified that as of Decedent's latest examination, in February of 1997, Decedent continued to suffer from a thoracic and lumbosacral sprain and strain, post-traumatic herniated disc at L4–5 and post-traumatic right L5 radiculopathy, all of which were caused by Decedent's May 2, 1994 work-related accident. (R.R. at 131a–32a.) Dr. Ingram also indicated that, from May of 1996 to February of 1997, Decedent's affect was depressed and that Decedent cried during office visits and showed signs of psychomotor retardation, a manifestation of depression. (R.R. at 137a.) Dr. Ingram attributed Decedent's depression to Decedent's inability to body build or work, due to the effects of Decedent's work-related injury. (R.R. at 139a.)

Dr. Contostavlos, who determined Decedent's cause of death to be suicide by fentanyl poisoning,[18] also identified significant conditions of depressive disorder in

**16.** Our scope of review is limited to determining whether an error of law was committed, whether constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

**17.** The WCJ, as the sole arbiter of credibility, is free to resolve conflicts in evidence and to determine the credibility of any witness, including medical experts, and this court is

bound by the credibility determinations made by the WCJ. *Dow v. Workers' Compensation Appeal Board (Household Finance Company),* 768 A.2d 1221 (Pa.Cmwlth.2001).

**18.** Dr. Contostavlos testified that his determination of suicide was based upon Decedent's notes, history of depression, history of suicide attempts and the enormous overdose of medication. (R.R. at 210a.)

Decedent. (R.R. at 215a.) Dr. Contostavlos further opined that anyone who commits suicide is to some degree deranged. (R.R. at 216a.)

Similarly, Dr. Lipetz opined that Decedent's chronic pain from his 1994 work injury, which was not responding completely to medication, made Decedent feel worthless, unable to enjoy activities and unable to see a career path, and caused Decedent to commit suicide. (R.R. at 389a.) Dr. Lipetz indicated that Dece-. dent's suicide was not a rational act. (R.R. at 394a.) In fact, Dr. Lipetz stated that, having known and treated Decedent before his 1994 work injury, he could see that Decedent's judgment must have been totally obscured for him to commit suicide. (R.R. at 395a.) Most significantly, Dr. Lipetz testified that Decedent's chronic pain led to depression of such severity as to override Decedent's normal rational judgment, resulting in Decedent's death. (R.R. at 393a–94a.) Thus, Claimant satisfied the chain of causation test set forth in *McCoy v. Workmen's Compensation Appeal Board (McCoy Catering Services, Inc.)*, 102 Pa.Cmwlth. 436, 518 A.2d 883 (1986), *appeal denied*, 517 Pa. 595, 535 A.2d 84 (1987).

■ Moreover, we disagree with Employer that Decedent's death was caused by Decedent's violation of the law so as to bar compensation under section 301(a). Decedent did not violate the law to obtain fentanyl; rather, Dr. Ingram prescribed the drug for Decedent to ease the pain from his work injury. (R.R. at 141a.) Although Decedent may have used the drug improperly, he did not do so illegally.[19]

■ Finally, Employer argues that the WCAB erred in awarding nine percent of the compensation award to Decedent's son, Ryan, because Ryan was not a member of Decedent's household. We disagree.

Pursuant to section 307(3) of the Act, 77 P.S. 561(3), if there is one child[20] of a decedent, the widow/widower is entitled to sixty percent of the decedent's wages.[21] In *Snader*, this court recognized that section 307(3), as written, presumes that the child is living with the widow/widower and, thus, does not apportion this sixty percent between the widow/widower and surviving child. However, we held that where the child of the decedent and the decedent's widow/widower live in separate residences, the benefits in section 307(3) are divided between the two, with the child receiving nine percent of the decedent's wages, and the widow/widower receiving fifty-one percent. Thus, although Claimant is not Ryan's mother and Ryan is not living with Claimant, Ryan is statutorily entitled un-

---

19. In support of its argument, Employer cites *City of Philadelphia v. Workers' Compensation Appeal Board (Cronin)*, 706 A.2d 377 (Pa. Cmwlth.), *appeal denied*, 555 Pa. 734, 725 A.2d 183 (1998), in which the deceased employee's cocaine use was a substantial contributing factor in his death. Clearly, use of an illegal drug such as cocaine is very different than the use, or misuse in this case, of a drug legally prescribed by a doctor for pain.

20. Pursuant to section 307 of the Act, 77 P.S. 562, compensation is payable to the child of the decedent if he or she is under the age of eighteen.

21. Employer also argues in its brief that Claimant lacked standing to assert a claim on Ryan's behalf. However, Employer has failed preserve this issue by stating it in the petition for review, as required by Pa. R.A.P. 1513. Thus, we need not address this issue. However, we do note that Claimant here never attempted to assert a claim on Ryan's behalf. Instead, she sought only to secure sixty percent of Decedent's benefits for herself pursuant to section 307(3) of the Act.

der section 307(3) of the Act to nine percent of Decedent's wages. *See Snader.*

Accordingly, we affirm.

### ORDER

AND NOW, this 19th day of April, 2002, the order of the Workers' Compensation Appeal Board, dated August 13, 2001, is hereby affirmed.