# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southeastern Transportation Authority :
(SEPTA), :
        Petitioner :
              :
      v. : No. 464 C.D. 2020
              : Submitted: October 9, 2020
Workers' Compensation Appeal :
Board (Hansell), :
        Respondent :

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
      HONORABLE P. KEVIN BROBSON, Judge[1]
      HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION BY
JUDGE COHN JUBELIRER      FILED: May 24, 2021

  Southeastern Transportation Authority (Employer) petitions for review of an
Order of the Workers' Compensation Appeal Board (Board), affirming a decision
by a Workers' Compensation Judge (WCJ) that granted a fatal claim petition filed
by Maureen Hansell (Claimant) related to the suicide of her husband Gregory
Hansell (Decedent). Employer argues the WCJ erred in concluding that Section
301(a) of the Workers' Compensation Act (WC Act),[2] 77 P.S. § 431, and case law
interpreting same did not bar compensation benefits as there was not substantial

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Brobson
became President Judge.

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 431. Section 301(a) provides:
"Every employer shall be liable for compensation for personal injury to, or for the death of each
employe, by an injury in the course of his employment . . . . Provided, [t]hat no compensation
shall be paid when the injury or death is intentionally self inflicted . . . ." *Id.*

evidence to support a finding that Decedent's mental illness was so severe as to obscure his rational judgment to the point that Decedent lacked the intent to commit suicide. Employer also argues that the WCJ erred in not applying what is known as the mental-mental standard, which requires a showing of abnormal working conditions in connection with Decedent's psychiatric illness. Upon review, the Court affirms, as there was substantial evidence to support the WCJ's findings and the mental-mental standard is inapplicable.

## I.  BACKGROUND

On June 17, 2016, while in the course and scope of his employment, Decedent suffered a lower back sprain, for which Employer issued a Notice of Compensation Payable (NCP). (WCJ Finding of Fact (FOF) ¶ 1; NCP, Certified Record (C.R.) Item 26.) Following the work injury, Decedent attempted light-duty work but was unable to do it. (FOF ¶ 3.c.) On March 19, 2017, Decedent committed suicide. Thereafter, Claimant filed a fatal claim petition, listing herself and their son as dependents, and alleging Decedent's work injury caused mental stress/illness which led to his suicide. (C.R. Item 2.) Employer denied the allegations, and the matter progressed to proceedings before the WCJ.

### A.  Claimant's Evidence

Claimant testified before the WCJ as follows.[3] She and Decedent married in 1999 and had a son in 2001. Decedent worked at Employer since 1984. According to Claimant, before Decedent's work injury in June 2016, Decedent was "fun-loving, caring, a wonderful father, good husband, [and] loved sports. Everything he did was

_____

[3] Claimant's testimony can be found in its entirety on pages 39a-75a of the Reproduced Record and is summarized in the WCJ Decision at Finding of Fact 3.

2

for [his son] and [Claimant]. [He was] just [a] family man." (FOF ¶ 3.c (quoting Reproduced Record (R.R.) at 42a).) Decedent did not appear to be depressed before the work injury and was able to work and take care of things around the house. (*Id.* ¶ 3.g.) However, after the work injury, Claimant noticed a gradual change in Decedent's personality beginning in September 2016 when he refused to go to a family reunion. His behavior continued to worsen. (*Id.* ¶ 3.f.) Claimant described Decedent as "depressed, obsessed, paranoid, delusional, illogical, [and] irrational." (*Id.* ¶ 3.d (quoting R.R. at 43a).) Claimant explained Decedent focused on losing his job and low back pain; worried about getting fired; thought they would lose their home, which was paid off before Claimant's suicide; believed that their son would not be able to attend private school; worried he was being followed; paced and looked out windows; and had trouble concentrating. (*Id.* ¶ 3.d-f.) According to Claimant, Decedent worried from the time he woke up to the time he went to bed, and none of Decedent's concerns were legitimate or valid. (*Id.* ¶ 3.d, e, m.) She testified that all of Decedent's conversations revolved around his work injury, which affected his relationship with Claimant and their son. (*Id.* ¶ 3.e-f.) Claimant described Decedent as being "consumed" with the back injury. (*Id.* ¶ 3.m.) Claimant explained she tried to be supportive and reassuring but acknowledged telling him he needed to "snap out of it." (*Id.* ¶ 3.f.) Claimant testified that nothing she told Decedent would convince him that things were fine. (*Id.* ¶ 3.e.)

Claimant testified that in 2007 Decedent treated with a psychiatrist for general anxiety and experienced a panic attack. He was prescribed 0.5 milligrams of Xanax. Decedent treated at Springfield Psychological Center from 2007 to 2015.

On Valentine's Day 2017, Claimant caught Decedent writing a suicide note. She also removed OxyContin from their house after she found Decedent researching

3

medication and how many to take to kill himself. She called 911 on February 27, 2017, because "'his behavior was so erratic and worrisome. Nobody could get through to him. He just needed help. I couldn't help him.'" (*Id.* ¶ 3.h (quoting R.R. at 50a).) Decedent was admitted to the hospital where he stayed until his discharge on March 10, 2017.[4] Upon discharge, Decedent was advised to follow-up with Dr. Jillian Cantor-Sackett, which he did on March 16, 2017. Claimant testified that Decedent attended an independent medical examination (IME) on March 17, 2017. Claimant drove Decedent to the IME and described him as being "a mess" and unable to write his name, think, or concentrate to the point he had difficulty answering simple questions about his pain. (*Id.* ¶ 3.h.) After the IME, Claimant described Decedent as quiet, calmer, and very sad. (*Id.*)

Claimant testified they had dinner together as a family on March 18, 2017. She stated there were no signs that she should be concerned. On March 19, 2017, Claimant left the house for approximately three hours to run some errands. Upon her return, Claimant could not find Decedent. After asking their son if he saw his father, she called a friend and Decedent's sister. Claimant ultimately found Decedent hanging in a shed and called 911. Claimant testified that when she found Decedent, he was very cold and rigor mortis had begun. After his death, Claimant found a receipt for rope purchased at Home Depot.

Claimant also presented the deposition testimony of Gladys Fenichel, M.D., who is certified by the American Board of Psychiatry and Neurology and testified as follows.[5] After reviewing Decedent's medical records, Dr. Fenichel agreed to

---

[4] Decedent's hospitalization was extended by two days after Claimant reported finding two guns and a noose at the house. (FOF ¶ 3.h.)

[5] Dr. Fenichel's testimony can be found in its entirety on pages 87a-147a of the Reproduced Record and is summarized in the WCJ Decision at Finding of Fact 4.

provide a report and testify for Claimant. Dr. Fenichel testified that from a review of Decedent's medical records, it was clear work was important to Decedent. At the time he sought a psychological evaluation on December 15, 2016, Dr. Fenichel testified that Decedent was not enjoying life, was quite sad and isolated, was not sleeping, felt as though he was letting everyone down, and was concerned about taking care of his family. He was diagnosed with "major depressive disorder, single episode moderate and panic disorder," and the primary stressor identified in the records "was the fact that [Decedent] was out of work." (*Id.* ¶ 4.b.) Decedent began treatment but ultimately discontinued the same less than two weeks later.

Dr. Fenichel testified that records from a crisis center, which examined Decedent immediately before his hospitalization in February 2017, confirm Decedent's psychological problems were caused by the work injury, as Decedent reported feeling depressed because he was injured and could not work. According to Dr. Fenichel, Decedent reported no problems before the work injury, but "was paranoid and depressed" before going to the crisis center. (*Id.* ¶ 4.c.) Upon admission to the hospital, Decedent admitted to planning to commit suicide. Dr. Fenichel testified the records attribute Decedent's depression and suicidal thoughts to the work injury. Decedent was discharged after stating he was feeling better and denying suicidal ideation. He was prescribed medication and advised to go to a day treatment program and follow-up with Dr. Sackett, which he did on March 17, 2017. Dr. Fenichel testified that Decedent told Dr. Sackett "there is no joy in [his] life, there is nothing, [he] ha[s] no function, work is [his] life, [his] identity." (*Id.* ¶ 4.e (quoting R.R. at 105a).) Decedent also continued expressing concerns about losing the house and his workers' compensation benefits.

Dr. Fenichel reviewed Decedent's medical records from Dr. Syed Rizvi, predating and post-dating the work injury. Dr. Fenichel testified that, before the injury, Decedent was treated for anxiety disorder with mixed emotions but not depression. Dr. Fenichel stated Decedent was not diagnosed with depression until December 2016, which was after the work injury. Dr. Fenichel testified that Dr. Rizvi noted Decedent had severe back pain, could not walk, and was feeling depressed. Dr. Rizvi prescribed an antidepressant for Decedent.

Dr. Fenichel testified Decedent did not see another mental health professional until February 2017 after his wife caught him writing a suicide note. Dr. Fenichel reviewed the suicide note[6] and testified the note explains "why [Decedent] was going to kill himself," shows Decedent was extremely upset because he thought he "messed it all up" with the work injury, and felt he was "in a corner." (*Id.* ¶ 4.g (quoting R.R. at 332a).) In the note, Decedent apologized to his wife and son and asked them to "try to remember him before [he] was hurt." (*Id.*) Dr. Fenichel testified that the note was consistent with Decedent's medical records attributing Decedent's depression to his pain and inability to work. Dr. Fenichel also testified that Decedent's medical records show a worsening of his depression from the time he was first diagnosed with major depressive disorder in December 2016 to his suicide in March 2017. Dr. Fenichel said the records identify the work injury as the stressor. (*Id.* ¶ 4.h.)

In Dr. Fenichel's professional medical opinion, "the work-related back injury on or about June 17, 2016, was the identified stressor that preceded the condition of major depression and suicide[,] and the work injury was a substantial contributing

---

[6] A copy of the suicide note is in the Reproduced Record at page 332a.

6

factor to [Decedent]'s suicide." (*Id.* ¶ 4.i (quoting R.R. at 116a).) Dr. Fenichel further opined:

> It is my opinion that everything I have stated so far in regard to the chronology of the work injury, the behavior of [Decedent] receiving Workers' Compensation, not feeling he is going to be able to provide for his family, he's worried about expenses, the life that he created, everything about him documents that he had a disturbance of mind that overrode normal judgment.

(*Id.* ¶ 4.j (quoting R.R. at 117a).) When asked whether Decedent acted rationally, Dr. Fenichel responded, "everything about the records referred to the major factors as the fact [Decedent] had his work injury and the pain, and he thought he would not be able to work again," and that this caused Decedent to experience a disturbance in thinking that overwhelmed his rational judgment. (*Id.* ¶ 4.*l* (quoting R.R. at 144a).) Dr. Fenichel acknowledged that Decedent knew what he was doing, intended to commit suicide, and knew what steps he needed to take to kill himself, but this did not change her ultimate opinion. (R.R. at 141a-42a, 146a.)[7]

### B.    Employer's Evidence

Employer presented the testimony of Ira Sachs, D.O., a board-certified orthopedic surgeon who performed an IME on Decedent two days before his suicide.[8] In addition to testifying about Decedent's physical condition, Dr. Sachs testified that he did not observe anything abnormal or unusual about Decedent's behavior during the IME. (FOF ¶ 5.d.) Dr. Sachs admitted he did not assess

---

[7] Claimant also submitted reports from Dr. Jeffrey Rihn and Dr. Christian Fras, which detailed the extent of Decedent's work injury and effect of his preexisting scoliosis on same. (*See* FOF ¶¶ 7-8 (summarizing same).)

[8] Dr. Sachs' testimony can be found in its entirety on pages 368a-402a of the Reproduced Record and is summarized in the WCJ Decision at Finding of Fact 5.

Decedent's mental stability or suicidal ideation, as it was not part of an IME. (*Id.* ¶ 5.e.) Nor did Dr. Sachs review Decedent's mental health records. (*Id.* ¶ 5.f.) He was also unaware that Decedent had just been hospitalized for his suicidal thoughts. (*Id.*) However, Dr. Sachs "did . . . confirm that the work injury significantly interfered with [Decedent's] enjoyment of life and relationships with other people." (*Id.*) Dr. Sachs opined Decedent had fully recovered from his work injury at the time of the IME. (*Id.* ¶ 5.d.)

Employer also presented the deposition testimony of Wolfram Rieger, M.D., a board-certified psychiatrist.[9] Dr. Rieger reviewed Decedent's medical records and testified that, in his opinion, Decedent's suicide was not related to his work injury. According to Dr. Rieger, "Decedent, unfortunately, had ongoing psychiatric problems that predate his work injury by many years . . . . [T]he back injury was, so to speak, only a blip on a – on a very busy, laid-out screen." (*Id.* ¶ 6.b (quoting R.R. at 187a).) Dr. Rieger testified that Decedent's back pain "was one of many" stressors, including concerns about his wife's sobriety, his son's ability to continue attending private school, financial concerns, feelings of worthlessness, and failing his family. (*Id.* ¶ 6.e-f.) Dr. Rieger also testified Decedent had paranoid thoughts. (*Id.* ¶ 6.e.) Dr. Rieger acknowledged that none of these concerns or suicidal thoughts were documented in any medical records predating the work injury. (*Id.* ¶ 6.e-g, i-j.) Dr. Rieger reviewed Decedent's records from Dr. Rizvi, which show a diagnosis of generalized anxiety but no evidence of depression. (*Id.* ¶ 6.j.) There was no indication of depression in Decedent's medical records until November 2016, which was after the work injury. (*Id.* ¶ 6.k.) Although he initially disagreed that records

---

[9] Dr. Rieger's testimony can be found in its entirety on pages 174a-303a of the Reproduced Record and is summarized in the WCJ Decision at Finding of Fact 6.

from Decedent's hospitalization shortly before his suicide show the work injury as a stressor, Dr. Rieger ultimately agreed that the hospital records did repeatedly reference depression and delusions beginning with the work injury and identify the work injury, related pain, and perceived financial stressors leading to his suicidal thoughts. (*Id.* ¶ 6.*l*.) Dr. Rieger similarly denied records from Springfield Psychological and Dr. Sackett that related Decedent's depression to the work injury, but on cross-examination acknowledged the records did indicate such and he omitted this from his report. (*Id.* ¶ 6.m.) Dr. Rieger also acknowledged excluding other information from his report, such as Decedent's statement that he was preoccupied with himself and complaining a lot when his wife remarked she was tired of hearing about his back, (*id.* ¶ 6.n), and notes from Dr. Sackett's last visit with Decedent three days before his death which reflect, among other things, "[s]tressor is loss of work secondary to back pain and the fear of the pain being permanent," (*id.* ¶ 6.p). In Dr. Rieger's opinion, Decedent would have committed suicide regardless of the work injury, (*id.* ¶ 6.g), which Dr. Rieger commented was "not that bad" based only upon his review of Dr. Sachs' IME, (*id.* ¶ 6.r).

### C.  *WCJ's Decision*

Based upon the evidence presented, the WCJ granted the fatal claim petition. In so holding, the WCJ credited the testimony of Claimant, noting it was "completely consistent with the available medical records and provided compelling, competent, and credible support for the opinion of Dr. [] Fenichel." (*Id.* ¶ 12.) The WCJ further found Dr. Fenichel's testimony credible, explaining Dr. Fenichel's opinion that Decedent's "work injury 'was the identified stressor' that caused [Decedent's] major depression and suicide is consistent with Claimant's testimony and every medical

9

record available in this matter." (*Id.* ¶ 13.) The WCJ rejected Dr. Rieger's testimony, finding it was not credible as there was "absolutely no support in the records" for his opinions. (*Id.* ¶ 14.) The WCJ further explained that Dr. Rieger

> conceded that all the available records point to [Decedent]'s work injury, including the pain from the injury and irrational financial concerns, as the stressors that led to his depression and suicidal ideation. The record confirms that [Decedent] was never diagnosed with depression prior to the work injury. He also admitted that none of these issues were discussed as problems in any medical record before the work injury. He incorrectly notes, with no support in the medical record, that [Decedent] "had documented depression" before the work injury. He incorrectly alleges that [Decedent] was diagnosed with depression by Dr. Rizvi prior to the work injury. He admits that [Decedent] was only treated with a starter dose, .5 mg of Xanax, for anxiety. The dose was never increased. His report states that [Decedent] had been confused for a long time. There is, however, no reference to [Decedent] reporting, or being found to be, in a confused state or suffering from confusion in any medical record. Dr. Rieger made that up. Again, he was never diagnosed with depression or reported a suicidal thought before the June 2016 work injury. Dr. Rieger made a reference to [Decedent]'s concern with his wife's sobriety. He was forced to admit that Claimant . . . stopped drinking years prior to the work injury and suicide. He admitted that not one record in this case points to Claimant's drinking history as the cause of [Decedent]'s suicide. Revealingly, even Dr. Rieger acknowledged the fact that his opinion is unsupported. He admitted that Dr. Fenichel's opinion was very clear. He further admitted that Dr. Fenichel's opinion is completely consistent with the records from Friends Hospital. By comparison, he could not provide one note that supported his opinion in this matter. Wherever his testimony differs from the testimony of Dr. Fenichel, it is rejected.

(*Id.*)

The WCJ further rejected Dr. Sachs' testimony to the extent Dr. Sachs opined that Decedent had fully recovered.[10] (*Id.* ¶ 16.)

---

[10] The WCJ, instead, credited the reports of Dr. Fras and Dr. Rihn.

10

Based upon these findings, the WCJ concluded that Claimant "established by competent and largely uncontested evidence" that Decedent suffered a work injury, which "directly caused [Decedent] to become dominated by a disturbance of mind of such severity to override normal rational judgment[,]" and that this "disturbance of the mind . . . resulted in [Decedent]'s suicide." (WCJ Decision, Conclusion of Law ¶ 3.)

### D.    Board's Opinion and Order

Employer appealed to the Board, which affirmed. The Board recounted the evidence as found by the WCJ and concluded, contrary to Employer's assertions, that there was substantial and competent evidence of record to support the WCJ's finding that Decedent suffered a mental disturbance that was so severe it obscured his rational judgment. (Board Opinion (Op.) at 10.) The Board also rejected Employer's argument that Decedent's suicide was planned and intentional. The Board concluded that Dr. Fenichel's testimony, which was credited by the WCJ, satisfied the chain-of-causation test for suicides. (*Id.*) The Board also rejected Employer's argument that the WCJ should have analyzed the fatal claim petition using a physical-mental standard, noting that requiring "proof of psychological injury would be redundant" of the chain-of-causation test. (*Id.*)

Employer now petitions for review of the Board's Order,[11] arguing first that Decedent's suicide was intentional and therefore, not compensable under the WC

---

[11] Our review is limited to determining whether constitutional rights were violated, errors of law were committed, or necessary findings of fact are supported by substantial evidence. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 331 n.2 (Pa. 2000). "'Substantial evidence' is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ryan v. Workmen's Comp. Appeal Bd. (Cmty. Health Servs.)*, 707 A.2d 1130, 1134 (Pa. 1998).

11

Act, and second, that because Decedent's mental condition was the result of a mental stimulus, Claimant had to demonstrate abnormal working conditions, which Claimant did not do. We address these issues in turn.

## II. DISCUSSION

### A. *Whether there is substantial evidence to support the WCJ's finding that Decedent's suicide was not intentional but instead was the result of a disturbance of the mind, which was directly caused by Decedent's work injury and overrode his normal rational judgment.*

Generally, workers' compensation benefits are not available for injuries resulting from intentional, self-inflicted acts. Section 301(a) of the WC Act provides:

> Every employer shall be liable for compensation for personal injury to, or for the death of each employe, by an injury in the course of his employment, and such compensation shall be paid in all cases by the employer, without regard to negligence, according to the schedule contained in [the Act]: Provided, [t]hat no compensation shall be paid when the injury or death is **intentionally self inflicted** . . . .

77 P.S. § 431 (emphasis added).

By its own definition, suicide is an intentional, self-inflicted act. *See* https://www.merriam-webster.com/dictionary/suicide (defining "suicide" as "the act or an instance of taking one's own life voluntarily and intentionally") (last visited April 15, 2021). However, the courts have permitted workers' compensation benefits in certain suicide cases. In *McCoy v. Workmen's Compensation Appeal Board (McCoy Catering Services, Inc.)*, 518 A.2d 883, 884-85 (Pa. Cmwlth. 1986), this Court first enunciated the chain-of-causation test, which provides that a suicide is compensable if: (1) there was initially a work-related injury; (2) the "injury directly caused the employee to become dominated by a disturbance of the mind of

12

such severity as to override normal rational judgment;" and (3) the "disturbance resulted in the employee's suicide." If this standard is met, the death is considered not intentionally self-inflicted and is, therefore, compensable. *Pa. Power & Light v. Workers' Comp. Appeal Bd. (Lechner)*, 719 A.2d 1116, 1119 (Pa. Cmwlth. 1998). Our Supreme Court subsequently adopted the chain-of-causation test in *Globe Security Systems Co. v. Workmen's Compensation Appeal Board (Guerrero)*, 544 A.2d 953, 956 (Pa. 1998), and it remains the controlling test.

Here, Employer argues that the WCJ erred in finding Section 301(a) of the WC Act did not bar Claimant from recovering for Decedent's suicide because the chain-of-causation test was not satisfied and, therefore, Decedent's suicide was intentional and not compensable. Employer argues it is not asking the Court to reweigh the evidence; instead, it argues that based upon the credited testimony of Claimant and Dr. Fenichel, as well as the suicide note and the medical records, one must conclude that Decedent's suicide was intentional. In addition to Dr. Fenichel admitting that the suicide was intentional, Employer cites Decedent's actions in the weeks and months leading up to his suicide for support. Specifically, Employer cites: (1) Decedent searching the internet for overdose information in February 2017; (2) medical records between December 2016 and February 2017 that show Decedent was of normal mood and affect; (3) a suicide note in February 2017, one month before his actual suicide, which shows the suicide was planned and Decedent contemplated the financial impact of his death; (4) records from his hospitalization showing he contemplated suicide for an extended period of time; (5) shortly before discharge from the hospital, health care professionals documented that Decedent was feeling better and had a normal thought process; (6) the lack of any evidence of suicidal tendencies based upon a visit with Dr. Sackett just three days before his

13

suicide; (7) Decedent appearing calmer following the IME and at dinner the night before his suicide; and (8) Decedent purchasing the rope used to hang himself in advance. Thus, according to Employer, Decedent's suicide was "meticulously planned and executed," (Employer's Brief (Br.) at 15), and, therefore, was intentional and not compensable.

Claimant responds that the decision awarding benefits is supported by competent, substantial evidence, as well as the case law. Claimant asserts there is no support for Employer's claim "that only an instant snap decision to commit suicide can satisfy the chain of causation test." (Claimant's Br. at 18.) Claimant points to *Lead v. Workers' Compensation Appeal Board (Sexton)*, 796 A.2d 431 (Pa. Cmwlth. 2002), in which a suicide three years after a work injury and after an intervening arrest was compensable. In the instant matter, Claimant argues the evidence shows that Decedent became depressed and suicidal as a result of the pain caused by his work injury. This pain and Decedent's irrational fears related to the work injury were the only stressors, according to Claimant. Claimant also argues that Dr. Fenichel unequivocally testified that Decedent's suicide was attributable to the work injury, and this opinion is supported by the fact that Decedent was never diagnosed with depression until after the work injury occurred and the identified stressor in the medical records was the work injury. This was also consistent with the suicide note, Claimant contends, because Decedent asked his family to remember him as he was before the work injury. Claimant argues the opinion expressed by Employer's expert, Dr. Rieger, was not supported by the record evidence and as a result was rejected by the WCJ. Claimant asks this Court to affirm the Board's Order because the chain-of-causation test was met.

14

Upon review of the record, we find no error in the WCJ's Decision granting the fatal claim petition. While Decedent's actions obviously show some planning on his part, we cannot conclude, as a matter of law, that this made his suicide intentional and, thus, not compensable. Employer appears to be trying to impose some sort of temporal proximity requirement when one does not exist. Rather, we must consider whether the work injury directly caused Decedent "to become dominated by a disturbance of the mind of such severity as to override normal rational judgment . . . and this disturbance resulted in [Decedent's] suicide." *McCoy*, 518 A.2d at 884-85.

Here, the record evidence supports the WCJ's finding that Decedent's work injury in June 2016 directly caused Decedent "to become dominated by a disturbance of the mind of such severity as to override normal rational judgment," which culminated in Decedent's suicide in March 2017. *Id.* Claimant described in detail how Decedent changed from a "fun-loving, caring, [] wonderful father, [and] good husband" to someone who was "depressed, obsessed, paranoid, delusional, illogical, [and] irrational" after the work injury. (R.R. at 42a-43a.) Claimant testified that all Decedent discussed with their son was the work injury. (*Id.* at 45a.) According to Claimant, Decedent was "consumed" by the back injury and resulting pain. (*Id.* at 67a.) Decedent's condition worsened to the point of writing a suicide note in February 2017. Shortly thereafter, Claimant called 911 because Decedent's "behavior was so erratic and worrisome." (*Id.* at 50a.) As a result, he was hospitalized for 10 days. Although Decedent appeared calmer to his wife in the few days leading up to his suicide, (*id.* at 53a, 55a), Dr. Fenichel testified this was not uncommon in someone who committed to ending his life, (*id.* at 140a).

15

Decedent's downward spiral, or as Claimant described it, trip down the "rabbit hole," (*id.* at 44a), following the work injury is also well documented in Decedent's medical records. Dr. Fenichel testified that in December 2016, Decedent was first diagnosed with depression. Dr. Fenichel further testified that all of the records attributed Decedent's depression and subsequent suicidal thoughts to the work injury. While Decedent expressed unfounded fears about losing his job and home or not being able to afford to pay tuition for his son to attend private school, these fears related back to the work injury and Decedent's inability to work because of same. In short, the common theme throughout the records was the work injury and how it negatively impacted Decedent's mental health.

This evidence formed the foundation of Dr. Fenichel's medical opinion that "the work-related back injury on or about June 17, 2016[,] was the identified stressor that preceded the condition of major depression and suicide[,] and the work injury was a substantial contributing factor to [Decedent]'s suicide." (R.R. at 116a.) Dr. Fenichel further opined that this created "a disturbance of mind that overrode normal judgment" and ultimately resulted in his suicide. (*Id.* at 117a.) When asked whether Decedent acted rationally, Dr. Fenichel responded, "everything about the records referred to the major factors as the fact [Decedent] had his work injury and the pain[,] and he thought he would not be able to work again[,]" and that this caused Decedent to experience a disturbance in thinking that overwhelmed his rational judgment. (*Id.* at 144a.)

Employer focuses on the following exchange with Dr. Fenichel during cross-examination:

> Q. And it is fair to say that [Decedent] knew what he was doing and had the intent to commit suicide at the end of the day?

A. I think I keep saying that, yes.

(*Id.* at 141a-42a.) On its surface, this appears to support Employer's position, but when Dr. Fenichel's testimony is evaluated as a whole, it becomes apparent that this one statement, taken out of context, does not require a different outcome. As described above, Dr. Fenichel unequivocally testified that Decedent experienced a disturbance of the mind as a result of the work injury, which overrode his rational judgment and led him to commit suicide. Further, immediately following the quoted exchange, Employer's counsel asked whether any suicide would be considered rational or irrational in Dr. Fenichel's opinion, and Dr. Fenichel again stated that following Decedent's work injury, Decedent's "thinking became so distorted by his worries about what he could do in the future that he would commit suicide . . . ." (*Id.* at 142a.) She continued that "there was nothing understandable" about Decedent's suicide and she "believe[d] that he lost rational judg[]ment when he committed suicide." (*Id.* at 143a.)

In summary, there is substantial evidence to conclude that Claimant satisfied the chain-of-causation test. There is no dispute that Claimant suffered a work-related injury. Second, as described above, there is ample evidence that this work injury "directly caused [Decedent] to become dominated by a disturbance of the mind of such severity as to override normal rational judgment." *McCoy*, 518 A.2d at 884-85. Finally, there is also substantial evidence to support a finding that this "disturbance resulted in [Decedent's] suicide." *Id.* Accordingly, we will not reverse the Board's Order on this basis.

17

***B. Whether the WCJ erred in applying the physical-mental standard instead of the mental-mental standard, which would have required a showing of abnormal working conditions.***

Our Supreme Court in *Ryan v. Workmen's Compensation Appeal Board (Community Health Services)*, 707 A.2d 1130, 1133-34 (Pa. 1998), explained there are three classifications of injuries involving a psychological component, each requiring a different burden of proof:  (1) a mental-physical injury, which occurs when "a psychological stimulus causes a physical injury;" (2) a physical-mental injury, which occurs when "a physical stimulus causes a psychic injury;" and (3) a mental-mental injury, which occurs when "a psychological stimulus causes a psychic injury."  It is the second and third in dispute here.

To prevail "[i]n a mental[-]mental case, a claimant must not only prove that [the claimant] has sustained an injury caused by [the claimant's] employment, but [the claimant] must prove an abnormal working condition caused the psychological injury." *Id.* at 1135 (citation omitted).  In addition, the abnormal working condition must be actual and objective, not subjective, perceived, or imaginary.  *Id.* at 1136 (citation omitted).  In contrast, "[a] claimant alleging a mental injury from a physical stimulus need only demonstrate that the physical stimulus caused the injury." *Gulick v. Workers' Comp. Appeal Bd. (Pepsi Cola Operating Co.)*, 711 A.2d 585, 588 (Pa. Cmwlth. 1998) (citation omitted).  "Thus, a claimant's burden in a physical-mental case is exactly the same as the burden generally utilized to determine workers' compensation eligibility:  that the injury arose in the scope of employment and is related thereto." *Id.* (quotation omitted).

Instantly, Employer contends the WCJ incorrectly used a physical-mental standard instead of a mental-mental standard.  Employer asserts there is no evidence that Decedent's mental illness was caused by his back pain.  At best, Employer argues, it was caused by subsequent events such as fear of losing his job and house,

concern his son could not continue attending private school, other financial concerns, and insurance fraud concerns. Therefore, Employer contends this case is analogous to *Ryan*, where the claimant's psychological injury was triggered by a lawsuit from an accident, not the work-related accident itself, or *Gulick*, where aggravation of a preexisting mental disorder was triggered by the filing of a termination petition by the employer. In both cases, the courts applied the mental-mental standard, which Employer argues should also apply here. Because there is no evidence of objective, abnormal working conditions, Employer argues the fatal claim petition must fail. Accordingly, Employer asks the Court to reverse the Board's Order or, alternatively, to vacate the Order and remand for the WCJ to apply the mental-mental standard.

Claimant responds that the Board was correct in concluding that the mental-mental standard has no place in suicide cases. Claimant points out that the cases relied upon by Employer did not involve suicides. Claimant also asks the Court to reject Employer's argument that because Decedent intentionally killed himself, his death is not compensable. Claimant responds that "[o]bviously, to some degree, every suicide is, by definition, an intentional act." (Claimant's Br. at 21.) Claimant argues the correct standard is the chain-of-causation test, which examines "whether [Decedent's] normal rational judgment was overridden by severe depression related to his work injury when he took his life." (*Id.*) For the reasons previously discussed, Claimant contends she met this standard.

Upon review, we discern no error in the WCJ **not** applying a mental-mental standard in this case. As discussed at length above, there is substantial evidence of record that Decedent's mental health declined as a result of a physical work injury to his back. Therefore, the mental-mental standard does not apply because the

19

psychological injury was not the result of a psychological stimulus. We are not persuaded by Employer's reliance on *Ryan* or *Gulick*. In *Ryan*, the Supreme Court concluded the claimant's psychological injury should be analyzed using the mental-mental standard and not the physical-mental one. 707 A.2d at 1135. The claimant had been involved in a work-related motor vehicle accident and subsequently developed psychological problems, such as depression, which she attributed to the accident. Based upon the WCJ's findings, the Supreme Court determined that the claimant's psychological problems arose upon learning that the other driver involved in the accident was suing her and, therefore, the mental-mental standard applied. *Id.* at 1134-35. In reaching this conclusion, the Supreme Court noted that the claimant's own expert witness testified that the claimant's psychological problems were triggered by the lawsuit, not the accident itself. *Id.* at 1135. The Supreme Court then concluded that, under the mental-mental standard, the claimant had not met her burden of proof. First, the Supreme Court held the claimant had not established that a psychological stimulus that caused the psychological injury arose during the course of her employment. *Id.* Instead, the Supreme Court stated, "[t]he automobile accident and physical injuries suffered by [the c]laimant have nothing more than a tangential or indirect relationship to causing [the c]laimant's psychological injury . . . ." *Id.* Next, the Supreme Court held the claimant could not show an abnormal working condition because "the evidence demonstrates that [the] claimant's psychological injury arose out of a subjective concern over a lawsuit filed by another party to the automobile accident." *Id.* at 1136.

Similarly, in *Gulick*, this Court held that aggravation of a claimant's preexisting mental condition should be proven using the mental-mental standard instead of the physical-mental one. In that case, the claimant suffered a lumbar

20

sprain, which the employer accepted, and subsequently alleged, in defense of a termination petition, that his work injury caused an aggravation of his schizophrenia. The WCJ rejected this contention, and the Board affirmed. On appeal, the claimant argued it was error to apply the mental-mental standard because it was the work injury that aggravated his preexisting mental condition. We disagreed, explaining that the WCJ credited the employer's expert, who testified that Claimant's schizophrenia was not related to the back injury, and discredited the claimant's expert, who testified that it was aggravated by same. 711 A.2d at 588. The Court also noted that the claimant himself testified that he was hospitalized because of "anxiety of knowing that [his] benefits were going to be terminated." *Id.* (citation omitted). Like the claimant in *Ryan*, the claimant in *Gulick* did not satisfy the elements of the mental-mental standard. *Id.*

Unlike the claimants in *Ryan* and *Gulick*, here the credited evidence establishes that Decedent's work injury caused Decedent's mental health issues. While there was some evidence that Decedent expressed fear of losing his job and home, or not being able to afford to keep his son in private school, there is ample evidence that this was part of the illogical and irrational thoughts that Decedent began to experience as a result of his back injury and resulting pain. Therefore, at best, the physical-mental standard would apply. However, because causation is already part of the chain-of-causation test, we agree with the Board that it would be redundant to apply the physical-mental standard.

## III. CONCLUSION

For the foregoing reasons, we affirm the Board's Order, which affirmed the WCJ's Decision granting the fatal claim petition.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southeastern Transportation Authority : 
(SEPTA), :
                Petitioner :
                 :
             v. :   No. 464 C.D. 2020
                 :
Workers' Compensation Appeal :
Board (Hansell), :
            Respondent :

## O R D E R

**NOW**, May 24, 2021, the Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge